UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GAIL LEWANDOWSKI,

       Plaintiff,

v.

COMPANION LIFE INSURANCE
COMPANY,

       Defendant.

_____/

Case No. 08-11538

HONORABLE STEPHEN J. MURPHY, III

## ORDER GRANTING (D/E #35) SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

This matter is before the Court on Plaintiff's Motion for Summary Judgment and
Defendant's Cross-Motion for Summary Judgment. (Docket Nos. 35 & 36). Plaintiff asserts
that Defendant wrongfully terminated her long-term disability (LTD) benefits in violation of
law.  For the reasons stated below, the Court finds that the Defendant's decision to
terminate benefits was arbitrary and capricious and grants Summary Judgment in favor of
plaintiff.

## BACKGROUND

Plaintiff Gail Lewandowski is a 61 year-old woman who was employed as the Day
Program supervisor at Sanilac County Community Mental Health Service (SCCMHS) from
November 3, 1986 through December 20, 2000. *See* Admin. Record at 82.[1] Her job duties
included overseeing the safety, supervision, and training of developmentally disabled
individuals as well as attending to clinical and administrative matters.  *Id.* at 445-48.

As an employee of SCCMHS, Lewandowski was eligible to receive LTD coverage
under the group disability insurance policy issued by Defendant, Companion Life Insurance

---

[1] Found at Docket No. 12.

Company ("Companion Life"), to SCCMHS.[2] Lewandowski submitted a claim for LTD

benefits that was dated March 1, 2001, and cited her Osteoarthritis as a basis for benefits.

*Id.* at 451. Companion Life notified Lewandowski on May 8, 2001 that her claim for LTD

benefits had been approved. *Id.* at 376-78.

Lewandowski also qualified for and began to receive Social Security Disability benefits

effective June 1, 2001. *Id.* at 451.  Subsequently, Lewandowski began receiving LTD

benefits from Companion Life, which was appropriately offset by the receipt of her Social

Security benefits, pursuant to the terms of the policy. *Id* at 376-78. Companion Life advised

Lewandowski that she would periodically be required to provide information to the company

proving that her disability was ongoing. *Id.* at 378.  The LTD policy expressly stated that

Companion Life has "discretionary authority to determine your eligibility for benefits and to

construe the terms of the policy and to make a benefits determination." *Id.* at 42.

On November 29, 2001, Companion Life contacted Lewandowski regarding the

possibility of paying her a lump sum in the amount of $50,000, as an alternative to making

monthly payments. *Id.* at 350.  Lewandowski rejected the offer and continued to receive

monthly benefits.[3]  After Lewandowksi received benefits for 36 months, Companion Life

sent Lewandowski a letter, dated March 26, 2004, advising her that to continue receiving

benefits, she had to prove that she was "unable to perform with reasonable continuity all

of the material and substantial duties of [her] own or any occupation for which [she] is or

---

[2] The policy is not governed by ERISA because SCCMHS is an exempt governmental entity. 29 U.S.C. § 1003(b). There is federal jurisdiction over the case based on diversity of citizenship under 28 U.S.C. § 1332. Both parties, however, rely on ERISA cases and assert that they are instructive in this context.

[3] Lewandowski asserts that she turned down the lump sum offer because it was "far less" money than she would receive by accepting monthly payments.  *See* Admin. Record at 155.

becomes reasonably fitted by training, education, experience, age and physical and mental capacity." *Id.* at 325.

Lewandowski submitted a claimant questionnaire, dated April 13, 2004, supplemented by a seven page statement.[4] *Id.* at 585-95. In the claimant questionnaire, Lewandowski indicated that she suffered from Osteoarthritis, Scoliosis, Carpal Tunnel Syndrome, degeneration of her joints, and trigger finger in her right thumb and ring finger. *Id.* She stated that as a result of these afflictions, she experienced constant pain. *Id.* With regard to her abilities and limitations, Lewandowski asserted that she was unable to stand for more than a few minutes; that her ability to walk depended on her "flare-ups", and some days she could barely walk across a room while other days she could take walks outdoors; and that sitting caused severe pain in her back and, as a result, she was required to sit in a reclined position with pillows supporting her. *Id.* at 585. She claimed that she always brought pillows with her when she went out. *Id.* Further, she stated that she was restricted from lifting more than five to ten pounds. *Id.* She explained in the claimant questionnaire that after having surgery the previous year, she could grip items, but that it was painful to do so. *Id.* At the time she submitted the claimant questionnaire, Lewandowski had upcoming surgery scheduled on her right wrist joint, which was to be followed by surgery on her thumb. *Id.* at 586. Lewandowski stated that twice per day she gave water to the animals at her home by turning on a hose and that she fed them with grain. *Id.* at 587. She further indicated that she and her husband brought their horses to participate as a volunteer in a "handicapped" riding program. *Id.* at 591. She stated, however, that her Thoracic spine was worsening, and that she often had to lie down throughout the day to relieve pressure in it. *Id.* at 586.

---

[4] Hereinafter, the claimant questionnaire and seven page supplemental statement will be referred to jointly as the "claimant questionnaire."

Lewandowski's physician, Rheumatologist Dr. Thomas Bryan, submitted a physical capacities evaluation on November 9, 2004 and indicated Lewandowski could lift and carry a maximum of eight pounds, push or pull a maximum of 20 pounds, and sit, stand, walk, climb stairs, or reach below waist-level occasionally but limited each activity to a maximum of 2.5 hours. *Id.* at 273-74. Dr. Bryan indicated at the time that Lewandowski could not stoop, kneel, crouch, or crawl. *Id.*

As a result of this information, Companion Life approved continuation of Lewandowski's LTD benefits.[5] *Id.* at 267. Companion Life, however, concurrently initiated an investigation of Lewandowski. Accordingly, video surveillance was conducted of Lewandowski on January 27 and January 28, 2005. The video surveillance showed that on January 27, Lewandowski was away from her home for approximately 3 hours and 15 minutes. During that time, she went to Dr. Bryan's office, and upon leaving, brushed snow and ice off her car with a scraper. *Id.* at 58. She then entered her vehicle by stepping onto the side rail. *Id.* Afterwards, she met her husband at his office and they went to lunch, which lasted from approximately 11:43 to 12:13. *Id.* She did not take pillows into the restaurant with her to use while sitting. *Id.* The next day, Lewandowski went to the Port Huron Heart Center. *Id.* Afterwards, she went to a shopping mall, where she shopped, while holding her purse and shopping bag. *Id.* At one point, she held the shopping bag over her shoulder for less than one minute. *Id.* While shopping, she was briefly seen bending to retrieve an item from a lower shelf. *Id.* Companion Life asserted that the video

---

[5] A letter dated November 29, 2004 was sent to Lewandowski informing her of this decision. *See* Admin. Record at 267.

was inconsistent with Lewandowski's description of her disability, and the claim was referred for a personal interview with Lewandowski.[6] *Id.*

On April 19, 2005 an interviewer went to Lewandowski's home for a scheduled interview. Upon arrival, the interviewer observed that "[Lewandowski] didn't appear to see me coming down the road and it looked as if she was walking with a limp." *Id.* at 465. The interviewer noted that throughout the interview, Lewandowski grimaced, winced, and changed positions several times. *Id.* at 465-66. She also appeared to have trouble holding a pen to sign her name. *Id.* During the interview, Lewandowski made a statement, consistent with previous statements, regarding her disability.[7] Once Lewandowski made the statement, the interviewer informed her that she had been videotaped and gave her the opportunity to watch the video. *Id.* at 156. After watching the video, Lewandowski stated that the activity observed on the video was "consistent with my normal level of functionality on occasion an average decent day." *Id.* at 476. She further asserted that her pain is constant throughout the day and that the activity on the video was "about my maximum and required rest the remainder of the days." *Id.* Lewandowski also offered explanations for the

---

[6] It should be noted that the video consists of approximately 22 minutes of actual footage of Lewandowski over the two day period and much of it is filmed through the windows of cars or through clothing racks at the mall. *See* Admin. Record at 597.

[7] According to the interviewer's report, Lewandowski stated that walking was difficult, but that, based on Dr. Bryan's recommendation, she was trying to walk for about one-half hour each day and only stopped when she experienced "shooting pains". *See* Admin. Record at 469. She explained that she was able to lift up to 2 pounds, but that she could not reach overhead and had difficulty gripping due to pain. *Id.* She indicated that she could squat when she needed to pick something up, but that it caused her pain. *Id.* She further stated that she could sit for approximately 30 minutes in a comfortable padded chair before experiencing "more difficulty." *Id.* at 471. Lewandowski asserted that she had difficulty getting in and out of the car. *Id.* She also informed the interviewer that she had undergone two surgeries in the last six months but was not under any treatment at the time of the interview, aside from physical therapy exercises she performed at home. *Id.* at 468.

portions of the video that Companion Life felt were contradictory to her previous statements regarding her disability.[8]

Companion Life sent the video and interview to Dr. Bryan for comment. *Id.* at 477. Dr. Bryan failed to respond, and Lewandowski's claim was referred to an independent medical consultant for review. *Id.* Board Certified Rheumatologist Dr. Brian Peck reviewed medical records, the video, and the interview conducted with Lewandowski. *Id.* at 144-47. After reviewing these items, he indicated that the medical records contained procedure notes, imaging studies, and descriptions of symptoms, but did not provide details of physical examinations, restrictions or limitations. *Id.* The records did, however, indicate Dr. Bryan's assertion that Lewandowski is disabled. *Id.* Dr. Peck attempted to contact Dr. Bryan several times, but Dr. Bryan failed to return his calls. *Id.* Dr. Peck observed that on the video, Lewandowski scraped windows "vigorously", handled her purse without difficulty, got into the car and walked across the snow "with ease", "flip[ped]" through racks of clothes while shopping, bent over easily, walked a "considerable distance" through the shopping mall, and held a shopping bag over her shoulder. *Id.* Based on these observations, Dr. Peck opined that Lewandowski could do light to sedentary work for eight full hours a day. *Id.* An Employability Analysis Report was then conducted, based on Lewandowski's functional capabilities, as determined by Dr. Peck, her education, training, and work history. *Id* at 188-233. The report found that Lewandowski could perform up to 52 different occupations. *Id* at 188-89.

Subsequently, Companion Life informed Lewandowski that she was no longer eligible to receive LTD benefits. *Id.* at 480-88. Companion Life submitted that the decision was

---

[8] Lewandowski's explanations are recounted more fully below in section 2 of the Analysis.

based upon: the claimant questionnaire; the video surveillance; the interview conducted with Lewandowski during the investigation; five unreturned calls to Dr. Bryan; Dr. Peck's analysis; and the Employability Analysis Report. *Id.* at 180-81. Lewandowski appealed the decision, and her file was reviewed a second time. *Id.* at 87. Lewandowski's claim was denied after the appeal. *Id. at 88.* The instant suit followed.

## STANDARD OF REVIEW

### 1. Summary Judgment

The parties have filed cross-motions for summary judgment pursuant to Federal Rules of Civil Procedure Rule 56. Fed. R. Civ. P. 56© provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

### 2. Discretionary Authority

The LTD policy language confers upon Companion Life the "discretionary authority to determine ... eligibility for benefits and to construe the terms of the policy to make a benefits determination." Language in Sixth Circuit ERISA cases nearly identical to that

cited in the policy above has previously been found to subject an insurer's decision to terminate benefits to review for arbitrariness and capriciousness by federal courts. *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 Fed. Appx. 734, 735-43 (6th Cir. 1998); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550 (6th Cir. 1998). Though the policy is not governed by ERISA, the parties do not dispute that this Court should review Companion Life's decision to deny benefits under an arbitrary and capricious standard.

Defendant argues that case law in the ERISA context regarding this standard is instructive, and the Court agrees. In that context, the Sixth Circuit has explained that arbitrary and capricious review:

> is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.

*Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (internal citations and quotations omitted).

In applying this standard in the ERISA context, the Sixth Circuit has found that the Court is not obligated to accord any special deference to the opinions of the claimant's treating physician. *Bishop v. Metropolitan Life Ins. Co.*, 70 Fed. Appx. 305, 311 (6th Cir. 2003) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)). Further, a plan administrator may rely on video surveillance to assist in the determination of eligibility. *Hanusik v. Hartford Life Insurance Co.*, No. 06-11258, 2008 WL 283714, at *3 (E.D. Mich., Jan. 31 2008); *see Wu v. Liberty Life Assur. Co. of Boston*, No: 1:05-cv-682, 2006 WL 1521947, at *4 (W.D. Mich. May 31, 2006) (plaintiff alleged she required a cane for ambulation but video surveillance showed that she was able to walk without assistance). A court must also consider the "possible conflicts of interest" that a plan administrator's

reviewing physician may have had in making a determination about the claimant's disability. *Calvert v. Firestar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005). Finally, a court must consider a plan administrator's decision to review a file rather than to conduct a physical examination. *Id* at 295.

## ANALYSIS

Lewandowski asserts that Companion Life relied primarily on the surveillance video in making a determination to terminate her LTD benefits. Lewandowski relies solely on *Hanusik v. Hartford Life Insurance Co.*, No. 06-11258, 2008 WL 283714, at \*3 (E.D. Mich., Jan. 31, 2008)(Hood, J.) for the proposition that the decision to terminate benefits is arbitrary and capricious when an insurer relies almost exclusively on video surveillance. In *Hanusik*, this Court found that when Hartford Life relied solely on video surveillance and unsupported conclusions of the insurer's physician, the decision by Hartford to terminate benefits was arbitrary and capricious, particularly when the court also considered the insurer's potential conflict of interest. *Id.*

Companion Life asserts that *Hanusik* is distinguishable from the present case for two reasons. First, Companion Life argues that it relied on Lewandowski's entire file when making the decision to terminate benefits. *See* Def. Cross-Motion for Summary Judgment (Docket #36 at 14). Second, Companion Life asserts that, unlike the claimant in *Hanusik*, Lewandowski was caught on tape engaging in activities that she claimed to be unable to do. The Court finds unavailing Companion Life's attempt to distinguish *Hanusik*.

1. Reliance on the Surveillance Video

Companion Life asserts that it relied on several pieces of evidence when terminating Lewandowski's benefits, including: the claimant questionnaire completed April 13, 2004; the video surveillance tape; the interview conducted with Lewandowski during the

investigation; five unreturned calls to Dr. Bryan; Dr. Peck's evaluation; and the Employability Analysis Report. But five of the ten pieces of evidence Companion Life cites in its termination letter are unreturned phone calls to Dr. Bryan. And while the failure of claimant's physician to return calls can certainly be considered when making a decision, some consideration should be given to the fact that Dr. Bryan had submitted documentation in November 2004 to Companion Life in which he concluded that Lewandowski was disabled and incapable of working. *See* Admin. Record at 270-71.

Moreover, the Court must consider the plan administrator's decision to review Lewandowski's file rather than to conduct its own physical examination. *Calvert*, 409 F.3d at 295. Most troubling about this case is the fact that Dr. Bryan's examination and report -- notwithstanding his apparent refusal to cooperate with Companion Life -- is unrebutted by any objective medical opinion. There is no evidence that any doctor has ever examined Lewandowski and found that she is able to work. Aside from competing views of the videotape evidence and the self-serving views of the parties, there is nothing based on medical fact in the record to lead the Court to conclude that Lewandowski is untruthful or that she is really able to work for eight hours a day, whatever the capacity.

Further, to terminate benefits, a defendant "must be provided with some new information to which it was not previously privy that establishes a Plaintiff's ability to work." *Hanusik v. Hartford Life Insurance Co.*, 2008 WL 283714 at *7; *see also, e.g., Wu v. Liberty Life Assurance Company of Boston*, 2006 WL 1521947, at *4. Companion Life did not rely on any new information in this case. The claimant questionnaire was submitted in April of 2004. Companion Life asserts that the information provided in the questionnaire appeared contradictory to both Lewandowski's complaints of severe and constant pain and to Dr. Bryan's evaluations, and that these contradictions led to the use of video surveillance in

January 2005. *See* Def. Cross-Motion for Summary Judgment (Docket #36 at 7). But on November 29, 2004, Lewandowski received a letter from Companion, stating that after "a thorough review," Companion Life had determined that she would continue to receive benefits. *See* Admin. Record at 267. Thus, the questionnaire itself can hardly be considered anything "new" at the time the benefits were terminated.[9]

Companion Life asserts that Dr. Peck reviewed Lewandowski's medical records in making his evaluation. Dr. Peck's report, however, indicates that Lewandowski's medical file contained mostly imaging studies and descriptions of symptoms, but did not contain details of physical examinations, restrictions, or limitations. *Id.* at 237. Thus, Dr. Peck's analysis was primarily based on the 22 minutes of video surveillance that was conducted over the course of two days. The Employment Analysis report was then subsequently based on Dr. Peck's evaluation, in conjunction with Lewandowski's education, training, and work history. Instead of obtaining and relying upon any objective medical evaluation to terminate benefits, Dr. Peck simply noted -- as does the Court -- the apparent absence of an objective medical exam, and his analysis of the videotape. But the length, depictions, and conclusions to be gleaned from the video surveillance are all open to interpretation and the Court is unable to say (absent any objective corroboration) that one party's view of the video is any less arbitrary than the other's.

All of this analysis stands in stark contrast to the facts of *Briggs v. Marriott Int'l, Inc.*, 368 F. Supp. 2d 461 (D. Md. 2005), which Companion Life cites in support of its argument that review of video evidence is sufficient on which to base its denial. In *Briggs*, the insurer reviewed video evidence in conjunction with over 500 pages of medical records,

---

[9] No one disputes that the interview conducted with Lewandowski during the investigation was consistent with her previous reports of her disability.

questionnaires, **and** an independent medical evaluation. *Id.*  Unlike the insurer in *Briggs*, however, Companion Life here chose **not** to conduct a physical examination before terminating the LTD benefits. As noted, courts must consider an insurer's decision to review a file rather than conduct a physical examination. *Calvert*, 409 F.3d at 295. When, as here, there is little medical documentation in the claimant's file of physical examinations, limitations, and restrictions, the decision to conduct merely a file review is circumspect. The Court can scarcely conclude anything other than that Companion Life relied primarily on video surveillance and nothing more in terminating Lewandowski's benefits.

    2. <u>Contradictory Evidence</u>

Companion Life cites numerous cases in which courts have found that an insurer's decision to terminate benefits based on contradictory evidence was not arbitrary and capricious.  In *Rose v. Hartford Financial Services Group*, 268 F. Appx. 444 (6th Cir., 2008), for instance, the claimant asserted that she was unable to stand for more than twenty to thirty minutes, that she needed help with shopping and home upkeep, and that she was unable to lift more than three to four pounds. *Id.* at 445-47.  In *Rose*, however, video surveillance was conducted over the course of two full days, the claimant was seen lifting a 37.5 pound bag of dog food and was also observed going to a produce stand, two convenience stores, and a grocery store. *Id.* Based on the evidence before it, the *Rose* court found that the insurer's decision to terminate benefits was not arbitrary and capricious. *Id.*

Similarly, in *Tsoulas v. Liberty Life Assurance Co. of Boston*, 397 F.2d 79, 86-87 (D. Maine 2005), the court upheld an insurer's decision to terminate benefits when a claimant described herself as needing to sleep for 14 to 18 hours per day, unable to walk without assistance and incapable of climbing stairs, yet a surveillance video showed her walking

up stairs, going to a tanning salon, a bank, a restaurant, a night club, a comedy club, and shopping, all without assistance. *Id; see also Wu*, 2006 WL 1521947, at \*9 (claimant claimed that she needed assistance for ambulation, yet physical therapists noted that claimant exaggerated her symptoms and video surveillance caught her walking without assistance); *Moore v. Metropolitan Life Insurance Co.*, No. 2:08-CV-06, 2010 U.S. Dist. LEXIS 6731, at \*8-\*9 (E.D. Tenn. Jan. 27, 2010) (claimant's physician reported that claimant had no ability to lift any weight or reach overhead but claimant was observed hoisting a bag of dog food onto his left shoulder and lifting boxes, large trash bags, a chair, and the tailgate for his truck and placing and/or throwing them into his truck).

Companion Life argues that, like the claimants in the cases cited above and unlike the claimant in *Hanusik*, Lewandowski was captured on video engaging in activities that contradict her self-reported abilities and her physician's analysis of her abilities. The Court has scrutinized the video evidence in the record carefully and disagrees. The video is consistent with Lewandowski's self-reported limitations and with her doctor's analysis. Any arguable discrepancies are slight, and certainly do not rise to the level of contradiction found in the cases cited by Companion Life.

For instance, Companion Life asserts that Lewandowski claimed she was unable to "reach overhead," yet she is seen on the video holding a shopping bag over her shoulder for less than one minute.[10] This action does not contradict Lewandowski's assertions. The shopping bag was, according to Lewandowski, filled with nightgowns.[11] Lewandowski and her doctor have consistently asserted that she can lift items less than five to ten pounds.

---

[10] Lewandowski explained during her interview that she was "probably" trying to get comfortable. *See* Admin. Record at 476.

[11] This claim is consistent with the footage seen in the videotape.

*See* Admin. Record at 585. Further, bending her elbow and carrying her bag over her shoulder for less than one minute can hardly be classified as "reaching overhead."

Companion Life also makes several arguments based on Dr. Peck's characterizations of Lewandowski's activity in the video.[12] Dr. Peck asserts that Lewandowski walked with "fluid" movements and "with ease", including when she walked across snow. Dr. Peck also observed that Lewandowski walked a "considerable distance" in the shopping mall. Even crediting Dr. Peck's potentially biased view of the evidence, neither conclusion is inconsistent with Lewandowski's previous description of her disability. On her claimant questionnaire, Lewandowski explained that her ability to walk depends on her "flare ups," and that some days she can barely walk across a room, while other days she can take walks outside. Her claim is supported by the fact that the Companion Life interviewer observed that Lewandowski was walking with a limp the day of the interview -- and that Lewandowski did not know she was being observed at the time (given that the interviewer stated he observed Lewandowski walking with a limp before she knew he had arrived at her house). Further, prior to being informed of the video surveillance, Lewandowski had told the interviewer that based on Dr. Bryan's recommendations, she had been trying to walk for up to a half-hour each day.

Companion Life similarly argues that Lewandowski did not take pillows into the restaurant with her in contradiction to her prior statements that she takes pillows with her

---

[12] It should be noted that the Court disagrees with the characterization of certain activities in the surveillance video. Dr. Peck asserts that Lewandowski scraped snow off her car "vigorously", yet, in reviewing the video, the Court found that there was little snow or ice on Lewandowski's car. Further, Companion Life asserted that Lewandowski was crouching and bending without apparent difficulty. The video, however, only shows Lewandowski bent at her waist with her knees slightly bent to reach something on a low shelf and to pick items up off the ground. (In the interview conducted with Lewandowski prior to watching the video, Lewandowski stated that she is able to bend "at the waist at 90 degrees" and can squat but that it causes her pain to do so.) *See* Admin. Record at 469.

14

to use when sitting. Lewandowski asserts, however, that there were pillows in her car but that the restaurant did not have chairs suited for the pillows and that she was only in the restaurant for approximately one-half hour. *See* Admin. Record at 164, 459. The video does not have footage of either the inside of Lewandowski's car or the restaurant to confirm or deny these claims, but it is absolutely true that Lewandowski was inside the dining establishment for only 30 minutes.

Several of Companion Life's arguments rely on the simple appearance that Lewandowski does not act like she is in pain in the video. Companion Life argues that Lewandowski is seen standing, driving, and getting in and out of cars without apparent pain. The Court rejects this argument. It is impossible to surmise from 22 minutes of video taken over the course of two days what Lewandowski's level of pain and fatigue are during or following such daily activity based upon the look on her face. Lewandowski asserts that on an average day she can accomplish tasks similar to those found on the video. She further asserts, however, that the video captures her maximum capacity and that following the level of activity shown in the video, she would be required to rest for the remainder of the day. The fact that Companion Life surveillance reports indicate that Lewandowski was only away from her home for between three and four hours each day supports this claim. Given the dearth of information in Lewandowski's file, it seems improbable that Lewandowski's level of pain could be judged based solely on 22 minutes of video, particularly given the decision not to conduct a physical evaluation.[13] *See Hanusik v. Hartford Life Insurance Co.*, 2008 WL 283714, at *14 (video evidence cannot be

_____

[13] Similarly, the Court finds it improbable that Companion Life -- without a physical examination -- could properly assess Lewandowski's claim that her right shoulder drops "significantly below level of left" based on interviewer observations and 22 minutes of video, in which Lewandowski is wearing a long winter coat.

reasonably relied on to refute claims that claimant cannot function after she over-exerts herself).

A court must take into account the "possible conflicts of interest" that a plan administrator's reviewing physician may have had in making a determination about the claimant's disability. *Calvert*, 409 F.3d at 292. Companion Life fully briefs this issue, but Lewandowski does not expressly assert a conflict of interest. She does imply impropriety on the part of Companion Life due to the fact that it terminated her benefits after she had received $49,500, only $500 less than the lump sum that she had refused. *See* Pl. Motion for Summary Judgment (Docket #35 at 8). While this is of note and perhaps even suspect, it is unnecessary to reach the issue insofar as the Court finds sufficient grounds to conclude that Companion Life's decision to terminate was arbitrary and capricious.[14]

## ORDER

Companion Life based its decision to terminate benefits primarily on 22 minutes of surveillance video. Further, the video evidence did not sufficiently contradict any of the information previously supplied to Companion Life by Lewandowski or Dr. Bryan. This is particularly true when the court considers Companion Life's decision to review Lewandowski's file rather than to conduct a physical examination in light of the scarce information contained in the file. Thus, the Court finds that the termination of Lewandowski's benefits was arbitrary and capricious.

---

[14] Nothing in this opinion precludes Companion Life from conducting a more thorough review of Lewandowski's file in accordance with this opinion in the future and terminating her benefits if objective factors support doing so.

WHEREFORE, it is hereby **ORDERED** that the clerk enter (D/E #35) Summary Judgment in favor of Plaintiff, Gail Lewandowski.


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: September 28, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 28, 2010, by electronic and/or ordinary mail.

Alissa Greer
Case Manager